# EXHIBIT 1

Filing # 121175613 E-Filed 02/10/2021 03:26:36 PM

IN THE CIRCUIT COURT OF THE _____ Fifteenth _____ JUDICIAL CIRCUIT,
IN AND FOR _____ Palm Beach _____ COUNTY, FLORIDA

Case No.: _____ 50-2021-CA-000884 _____
Division: _____ AE _____

_____ Freedom Watch, Inc. _____,
Petitioner,

and

_____ Amazon Web Services Inc, et al _____,
Respondent.

## SUMMONS: PERSONAL SERVICE ON AN INDIVIDUAL
## ORDEN DE COMPARECENCIA: SERVICIO PERSONAL EN UN INDIVIDUO
## CITATION: L'ASSIGNATION PERSONAL SUR UN INDIVIDUEL

TO/PARA/A: {enter other party's full legal name} Amazon Web Services, Inc. _____,
{address (including city and state)/location for service} 410 Terry Avenue North, Seattle, WA 98109-5210 .

## IMPORTANT

A lawsuit has been filed against you.  You have **20 calendar days** after this summons is served on you to file a written response to the attached complaint/petition with the clerk of this circuit court, located at: {street address} _____.
A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be **filed** if you want the Court to hear your side of the case.

**If you do not file your written response on time, you may lose the case, and your wages, money, and property may be taken thereafter without further warning from the Court.**  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, you must also serve a copy of your written response on the party serving this summons at:

{Name and address of party serving summons} Larry Klayman, 7050 W. Palmetto Park Rd, Boca Raton, FL 33433 _____

_____

**If the party serving summons has designated email address(es) for service or is represented by an attorney, you may designate email address(es) for service by or on you.  Service must be in accordance with Florida Rule of Judicial Administration 2.516.**

**Copies of all court documents in this case, including orders, are available at the Clerk of the Circuit Court's office.  You may review these documents, upon request.**

**You must keep the Clerk of the Circuit Court's office notified of your current address.  (You may file Designation of Current Mailing and Email Address, Florida Supreme Court Approved Family Law Form**

Florida Family Law Rules of Procedure Form 12.910(a), Summons: Personal Service on an Individual (03/17)

12.915.) **Future papers in this lawsuit will be mailed to the address on record at the clerk's office.**

**WARNING: Rule 12.285, Florida Family Law Rules of Procedure, requires certain automatic disclosure of documents and information.  Failure to comply can result in sanctions, including dismissal or striking of pleadings.**

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Localizado en: _____.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, usted puede consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presente su respuesta ante el tribunal, usted debe enviar por correo o entregar una copia de su respuesta a la persona denominada abajo.

Si usted elige presentar personalmente una respuesta por escrito, en el mismo momento que usted presente su respuesta por escrito al Tribunal, usted debe enviar por correo o llevar una copia de su respuesta por escrito a la parte entregando esta orden de comparencencia a:

Nombre y direccion de la parte que entrega la orden de comparencencia: _____

_____.

**Copias de todos los documentos judiciales de este caso, incluyendo las ordenes, estan disponibles en la oficina del Secretario de Juzgado del Circuito [Clerk of the Circuit Court's office].  Estos documentos pueden ser revisados a su solicitud.**

**Usted debe de manener informada a la oficina del Secretario de Juzgado del Circuito de su direccion actual. (Usted puede presentar [ ] el Formulario: Ley de Familia de la Florida 12.915, Florida Supreme Court Approved Family Law Form 12.915, [Designation of Current Mailing and Email Address].)  Los papelos que se presenten en el futuro en esta demanda judicial seran env ados por correo a la direccion que este registrada en la oficina del Secretario.**

**ADVERTENCIA: Regla 12.285 (Rule 12.285), de las Reglas de Procedimiento de Ley de Familia de la Florida [Florida Family Law Rules of Procedure], requiere cierta revelacion automatica de documentos e informacion.  El incumplimient, puede resultar en sanciones, incluyendo la desestimacion o anulacion de los alegatos.**

## IMPORTANT

Des poursuites judiciaires ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Qui se trouve a: *{L'Adresse}* _____.  Un simple coup de telephone est insuffisant pour vous proteger; vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende

votre cause. Si vous ne deposez pas votre reponse ecrite dans le delai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite a la partie qui vous depose cette citation.

Nom et adresse de la partie qui depose cette citation: _____

**Les photocopies de tous les documents tribunals de cette cause, y compris des arrets, sont disponible au bureau du greffier.  Vous pouvez revue ces documents, sur demande.**

**Il faut aviser le greffier de votre adresse actuelle.  (Vous pouvez deposer Florida Supreme Court Approved Family Law Form 12.915, Designation of Current Mailing and Email Address.)  Les documents de l'avenir de ce proces seront envoyer a l'adresse que vous donnez au bureau du greffier.**

**ATTENTION: La regle 12.285, des regles de procedure du droit de la famille de la Floride exige que l'on remette certains renseignements et certains documents a partie adverse. Tout refus de les fournir pourra donner lieu a des sanctions, y compris le rejet ou la suppression d'un ou de plusieurs actes de procedure.**

THE STATE OF FLORIDA
TO EACH SHERIFF OF THE STATE:  You are commanded to serve this summons and a copy of the complaint in this lawsuit on the above-named person.

DATED: __**Feb 12 2021**__

(SEAL)

**JOSEPH ABRUZZO**
CLERK OF THE CIRCUIT COURT

By: _____
Deputy Clerk   **JOSIE LUCCE**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

FREEDOM WATCH, INC.,

               Plaintiff,

    v.

AMAZON WEB SERVICES, INC.,
APPLE INC., and GOOGLE LLC,

               Defendants.

Case Number:

## COMPLAINT

Plaintiff, FREEDOM WATCH, INC. ("FREEDOM WATCH") hereby files this action against Defendants AMAZON WEB SERVICES, INC. ("AWS"), APPLE INC. ("APPLE"), and GOOGLE LLC ("GOOGLE") for intentional interference with business relationships or contracts.

## JURISDICTION AND VENUE

1.    This is an action for intentional interference with business relationships or contracts, seeking compensatory damages in excess of $15,000.00 but less than $75,000.00 exclusive of costs, interest, and attorney's fees, along with preliminary and permanent injunctive relief.

2.    This Court has personal jurisdiction over Defendants AWS, APPLE, and GOOGLE as they have engaged in sufficient substantial contacts and committed tortious acts with and within this county and have purposefully availed themselves of the benefits and protections of Florida law, such that the Defendants should reasonably anticipate being hailed

1

into court here, and the exercise of jurisdiction over AWS, APPLE, and GOOGLE would comport with due process requirements.

3.     Venue for this action is properly in Palm Beach County, Florida, as (i) Plaintiff FREEDOM WATCH is registered to do business in Florida and has a place of business in this county at 7050 W. Palmetto Park Road, Boca Raton, Florida 33433; (ii) Defendants AWS, APPLE, and GOOGLE do business in this county; and (iii) a substantial part of the events that give rise to Plaintiff FREEDOM WATCH's claims occurred in this county and circuit.   Further, Larry Klayman, the chief operating officer, president, and general counsel of FREEDOM WATCH resides in this county and is a Florida citizen, having even run for the U.S. Senate in this county and in Florida as whole.   Mr. Klayman has been licensed to practice law in Florida and in this county since December 7, 1977, that is for 44 years.   In view of Mr. Klayman's substantial presence here and inasmuch as Floridians have more freedoms than do the citizens in virtually any other state except Texas, the activities of FREEDOM WATCH are substantially centered in and heavily dependent on this county and Florida as a whole, which is the third largest and one of the fastest-growing states in population in the nation.

## THE PARTIES

4.     Plaintiff FREEDOM WATCH is a non-profit political interest group dedicated to preserving American freedom by (i) protecting Americans' constitutional rights to privacy, free speech, and civil liberties, (ii) protecting America from corrupt business, labor, and government officials, (iii) preserving America's freedom from foreign oil, (iv) preserving our national sovereignty against the terrorist state-controlled United Nations and socialistic, globalist interests, and (v) re-establishing the rule of law in America's legal system. By promoting true American values at home and around the world through concrete action – often utilizing hard-

2

hitting legal cases and citizens grand juries – and through public advocacy and education in the media, FREEDOM WATCH is at the forefront of preserving American freedom for today's and succeeding generations.

5.      As a non-profit, educational organization formed under 26 U.S.C. § 501(c)(3), Plaintiff FREEDOM WATCH depends on free access to the public square as a means for (i) participating in public debate, (ii) educating the public and disseminating its message to concerned American citizens and others around the world, and (iii) raising the funds necessary to support the effective and robust delivery of its message. In today's Internet age, FREEDOM WATCH's ability to effectively access the public square depends heavily on unconstrained access to Internet-based social media platforms. When operated free of inappropriate censorship and discrimination, these social media platforms enable free and robust public debate, discussion, and education and provide organizations such as FREEDOM WATCH with broad-based, real-time access to interested citizens and critical funding sources on a subscription-free basis. They enable FREEDOM WATCH to efficiently and cost-effectively reach millions of Americans and efficiently perform its function as a Section 501(c)(3) educational non-profit foundation.

6.      On information and belief, Defendant AWS is an Amazon.com, Inc. company, and is a Delaware corporation with its principal place of business in Seattle, Washington. It is the world's leading cloud service (web hosting) provider, capturing a third of the global market. *See* Global Cloud Infrastructure Market Q3 2020, https://www.canalys.com/newsroom/worldwide-cloud-market-q320. AWS generates tens of billions of dollars in revenue annually and dwarfs the other providers in the market, *id.,* much of

which is derived from its substantial business in Florida, the nation's third largest and among the fastest growing states in population.

7.     According to admissions in its own press release, "[f]or 14 years, [AWS] has been the world's most comprehensive and broadly adopted cloud platform." *Twitter Selects AWS as Strategic Provider to Serve Timelines,* Press Center, Amazon (Dec. 15, 2020), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines.   That is why "[m]illions of customers – including the fastest-growing start-ups, largest enterprises, and leading government agencies – trust AWS to power their infrastructure, become more agile, and lower costs." *Id.*   In short, AWS is the leading cloud platform/web hosting service available to, and chosen by, social networking platforms such as Twitter, Inc. and Parler LLC.

8.     Defendant APPLE is a Delaware corporation with its principal place of business in Cupertino, California. APPLE is a multinational technology company that designs, develops, and sells consumer electronics, computer software, and online services.   The company's hardware products include the iPhone smartphone, the iPad tablet computer, and the Mac personal computer. APPLE's software includes iOS (its smartphone operating system), iPad OS (its tablet computer operating system), and macOS (its personal computer operating system). Its online services include the iOS App Store and the Mac App Store, where customers can obtain and download a wide variety of software programs ("apps"), such as social networking platform apps, which are compatible with APPLE's operating system software.

9.     Until recently, APPLE made PARLER's app available for download at the App Store and enabled PARLER to push to the App Store new/updated versions of the PARLER app.

4

This enabled PARLER to provide users with an app which would be compatible with software updates APPLE routinely makes to its iOS, iPad OS, and macOS operating systems.

10.     APPLE purportedly requires, as a contractual condition of distribution through its App Store, that apps which display user-generated content online, such as the one created by Parler LLC, have (and implement) moderation and enforcement policies that remove certain purportedly objectionable content, such as posts that incite violence.

11.     On information and belief, Defendant GOOGLE is a subsidiary of Alphabet Inc. and is a Delaware limited liability company with its principal place of business in Mountain View, California.   GOOGLE is a multinational provider of Internet-related services and products, including online advertising technologies, its ubiquitous Internet search engine, cloud computing services, software (including the Android operating system used in many smartphones), and hardware.

12.     GOOGLE operates an online store (the GOOGLE Play store) where it offers apps which Android mobile phone users can download to enable them to access and utilize many different online services on their phones, including social networking platforms.

13.     Until recently, GOOGLE made PARLER's app available for download at the GOOGLE Play store and enabled PARLER to push to the GOOGLE Play store new/updated versions of the PARLER app.  This enabled PARLER to provide users with an app which would be compatible with software updates GOOGLE routinely makes to its Android smartphone operating system.

14.     GOOGLE purportedly requires, as a contractual condition of distribution through its Play store, that apps which display user-generated content online, such as the one created by

5

Parler LLC, have (and implement) moderation and enforcement policies that remove certain purportedly objectionable content, such as posts that incite violence.

## **BACKGROUND FACTS**

15.    On information and belief, Parler LLC ("PARLER") is a Nevada limited liability corporation with its principal place of business in Henderson, Nevada.   Until its online operations were wrongfully shut down by Defendant AWS, PARLER provided a microblogging and social networking platform which enabled users to post messages and interact online in real time.   On information and belief, PARLER's platform was launched to encourage free speech and provide an uncensored forum for the exchange of information and ideas.   It is no coincidence that Parler was named after the French verb "parler," meaning "to speak."

16.    PARLER contracted with AWS to provide the cloud computing/web hosting services PARLER needed for its apps and website to function on the Internet.   On information and belief, PARLER's apps and website were written to work with AWS's technology.   Making a change to a different web hosting service provider could require PARLER to rewrite that computer code.   If that were to become necessary, it would likely knock PARLER offline for a devastating period of time.

17.    Twitter, Inc. ("TWITTER") is a microblogging and social networking service based in San Francisco, California, on which users post and interact with short messages known as "tweets."   Registered users can post, like, and retweet messages, while unregistered users can only read them.   Users access TWITTER through its website interface or its mobile-device application software.   Tweets are limited in length to 280 characters.   Audio and video tweets are limited to 140 seconds for most users.

18.     PARLER is a competitor of TWITTER as both provide a similar platform for users to communicate with short messages, links, and pictures.  Like TWITTER and some other social media platforms, PARLER's business model is not based on subscription fees.  On information and belief, PARLER's business model is premised on its ability to lure conservative influencers and others onto the platform, then help match them up with advertisers, and take a share of the fee the influencers charge the advertisers to promote the advertiser's products.

19.     It has been reported that in December 2020, AWS and TWITTER signed a multi-year contract so that AWS could support the daily delivery of millions of tweets on the TWITTER platform.  According to the AWS's press release, "Twitter will leverage AWS's proven infrastructure and portfolio of services to support delivery of millions of daily Tweets." *Twitter Selects AWS as Strategic Provider to Serve Timelines,* Press Center, Amazon (Dec. 15, 2020), https://press.aboutamazon.com/news-releases/news-release-details/twitter-selects-aws-strategic-provider-serve-timelines.  The AWS/TWITER contract "buil[t] on the companies' more than decade-long collaboration, where AWS continues to provide Twitter with storage, compute, database, and content delivery services to support its distribution of images, videos and ad content." *Id.*  The press release further states that together "Twitter and AWS will create an architecture that extends Twitter's on-line premises infrastructure to enable them to seamlessly run and scale the real-time service globally, increase its reliability . . . , and rapidly move new features into production around the world." *Id.*

20.     At the same time, PARLER began to significantly increase its usership at the expense of TWITTER.  After the election in November 2020, the New York Times reported that "millions have migrated to alternative social media and media sites like Parler . . . ."  Mike Isaac & Kellen Browning, *Fact-Checked on Facebook and Twitter, Some Conservatives Switch Their*

*Apps,* NY Times (Nov. 18, 2020), https://www.nytimes.com/2020/11/11/technology/parler-rumble-newsmax.html.  In less than a week after Election Day, between November 3 and 8, 2020, PARLER's app experienced nearly one million downloads.  *See Parler, A Conservative Twitter Clone, Has Seen Nearly 1 Million Downloads Since Election Day,* The Verge (Nov. 9, 2020), https://www.theverge.com/2020/11/9/21557219/parler-conservative-app-download-new-users-moderation-bias.  This resulted in PARLER rocketing to be "the #1 free app in the iOS App Store, up from #1,023" only a week earlier.  *Id.*  Similarly, in that same week, the PARLER app went from 486th to first in the Google Play rankings.  *Id.*  Not surprisingly, "the app was the 10[th] most downloaded social media app in 2020 with 8.1 million new installs."  Jonathan Schieber, *Parler Jumps to No. 1 on App Store After Facebook and Twitter Ban Trump,* TechCrunch (Jan. 9, 2021), https://techcrunch.com/2021/01/09/parler-jumps-to-no-1-on-app-store-after-facebook-and-twitter-bans/.

21.    In 2021, this trend accelerated, following TWITTER's announcement on January 9, 2021 that it would permanently ban President Donald J. Trump from its platform.  *Id.*  On that day, PARLER saw installs increase in the United States by 355%.  *Id.*  After TWITTER's announcement, conservative politicians and media figures began encouraging their followers to switch to PARLER.  *See* Yelena Dzhanova, *Top Conservative Figures Are Tweeting to Advertise Their Parler Accounts After Trump Was Permanently Banned From Twitter,* Business Insider (Jan. 9, 2021), https://businessinsider.com/top-conservatives-moving-to-parler-after-trumps-ban-from-twitter-2021-1.  *See also* Joseph A. Wulfsohn, *Conservatives Flee to Parler Following Twitter's Permanent Suspension of Trump,* Fox News (Jan. 9, 2021), https://foxnews.com/media/conservatives-join-parler-twitter-trump-ban.

22.     Speculation began to grow that President Trump would also move to PARLER. *Id.* In view of the nearly 90 million followers President Trump had on TWITTER, this would be a huge gain for PARLER and a giant loss for TWITTER.   *See Donald J. Trump (@realDonaldTrump)          Twitter          Statistics,*          Socialbakers, https://www.socialbakers.com/statistics/twitter/profiles/detail/2507387-realdonaldtrump.

23.     In the context of TWITTER's looming loss to PARLER of tens of millions of Trump followers and the fact that TWITTER's ban would not muzzle and censor the President for long if he switched to PARLER, AWS quickly and maliciously moved to shut down PARLER.

24.     On or about January 9, 2021, at 6:07 pm PST, web news site BuzzFeed posted an article with screenshots of a letter from AWS to PARLER, informing PARLER that its account would be suspended at 11:59 pm PST on January 10, 2021, less than 30 hours later. *See* John Paczkowski, *Amazon Is Booting Parler Off Its Web Hosting Service,* BuzzFeed (Jan. 9, 2021), https://buzzfeednews.com/article/johnpaczkowski/amazon-parler-aws. It has been reported that the BuzzFeed article with the letter was posted before PARLER itself received the letter in an email at 7:19 pm PST, more than an hour after the BuzzFeed article went online, meaning that AWS leaked the letter to the leftist anti-Trump publication BuzzFeed before sending it to PARLER.

25.     On January 9, 2021, the Associated Press reported that "Parler may be the leading candidate for" President Trump after his TWITTER ban as "[e]xperts had predicted Trump might pop up on Parler . . . ." Frank Bajak, *Squelched by Twitter, Trump Seeks New Online Megaphone,* Associated Press (Jan. 9, 2021), https://apnews.com/article/donald-trump-politics-media-social-media-coronavirus-pandemic-f5b565ca93a792640211e6438f2db842.     However,

the Associated Press also observed that "Amazon struck [a] blow Saturday [against the chances of Trump adopting the platform], informing Parler it would need to look for a new web-hosting service effective midnight Sunday." *Id.*

26.     The result for PARLER has indeed been devastating and seriously threatens its future survival.   On information and belief, PARLER has tried to find other web hosting services, but until perhaps recently, was unable to find an alternative to AWS that would enable PARLER to eventually restore its service.   Without AWS, PARLER has had no way to get online and reach existing and potential users.   PARLER is now claiming to be working to resume online operations using Epik, a domain name registrar and web hosting service to house and support PARLER's social networking platform.   However, as of January 16, 2021, PARLER's presence on the Internet was just a static webpage announcing its intention to return to full online operation by the end of January 2021.   Grace Dean, *Parler's CEO John Matze Is 'Confident' the Controversial Social-Media Platform Will Fully Return by the End of January, After Amazon Booted it Offline,* Business Insider, (Jan. 18, 2021), https://www.msn.com/en-us/money/other/parlers-ceo-john-matze-is-confident-the-controversial-social-media-platform-will-fully-return-by-the-end-of-january-after-amazon-booted-it-offline/ar-BB1cQVh0?ocid=uxbndlbing.   On information and belief, just the delay from 11:59 pm PST on January 10, 2021, when PARLER went offline, to the end of January 2021, when PARLER hopes to resume full online operation, will severely and perhaps fatally injure it, as users move on to other online social networking platforms.

27.     PARLER has also been harmed, and its survival as a free speech oriented social networking platform is still in grave jeopardy, as a result of actions taken, apparently in concert, by joint tortfeasors Defendants APPLE and GOOGLE.

28.     On Friday, January 8, 2021, GOOGLE removed the PARLER app from GOOGLE's flagship Android app store, the GOOGLE Play store. GOOGLE did so in the context of growing speculation that President Trump might jump to PARLER after being barred from TWITTER and, on information and belief, with the understanding that TWITTER's ban would not muzzle or censor President Trump for long if he switched to PARLER. GOOGLE therefore quickly, intentionally, and maliciously moved to remove the PARLER app from the Play store.

29.     GOOGLE purportedly removed the PARLER app from its Play store because GOOGLE was dissatisfied with PARLER's moderation of allegedly objectionable content on its social networking platform. Lucas Matney, *Parler removed from Google Play store as Apple App Store suspension reportedly looms,* TechCrunch (Jan. 9, 2021), https://www.msn.com/en-us/news/technology/parler-removed-from-google-play-store-as-apple-app-store-suspension-reportedly-looms/ar-BB1cB6ny. GOOGLE's purported reason for removing the PARLER app from the Play store was a pretext, inasmuch as TWITTER remains available at the Play store notwithstanding TWITTER's well-established history of attracting, and maintaining online, numerous posts that incite violence against others, examples of which are described in paragraphs 38-41 below. On information and belief, GOOGLE has not removed the TWITTER app from the GOOGLE Play store or demanded that TWITTER remove allegedly objectionable content from TWITTER's social networking platform. The disparate treatment of PARLER and TWITTER makes clear that GOOGLE's removal of the PARLER app from the Play store was pretextual and was motivated not by any breach of GOOGLE's terms of service, but rather by animus against President Donald J. Trump and his ideological supporters such as Larry Klayman

and FREEDOM WATCH, as well as millions of PARLER users, including Plaintiff FREEDOM WATCH.

30.     While PARLER users who already have the PARLER app on their Android smartphones will be able to resume using the PARLER social networking platform if it comes back online in the reasonably foreseeable future, PARLER users whose smartphones contain the Android operating system will eventually lose their ability to access and use PARLER.   On information and belief, in 2020, GOOGLE began its release of Android 11, a new version of the Android smartphone operating system, but the release of Android 11 is not yet complete and will continue well into 2021.   On information and belief, PARLER users will need an app update to be able to continue accessing PARLER on their smartphones equipped with the latest version of the Android operating system.   Thus, GOOGLE's decision to remove the PARLER app from the GOOGLE Play store will block existing PARLER users and potential new PARLER users from accessing PARLER using their Android smartphones.

31.     On Friday, January 8, 2021, APPLE notified PARLER that it would remove the PARLER app from APPLE's App Store within 24 hours unless PARLER submitted to APPLE a moderation improvement plan that would remove allegedly objectionable content from PARLER's website.   Lucas Matney, *Parler removed from Google Play store as Apple App Store suspension reportedly looms, supra.*   APPLE made this demand to PARLER in the context of growing speculation that President Trump might jump to PARLER after being barred from TWITTER and, on information and belief, with the understanding that TWITTER's ban would not muzzle or censor the President for long if he switched to PARLER.   APPLE therefore quickly, intentionally, and maliciously moved to remove the PARLER app from the App Store. As of January 9, 2021, APPLE had removed the PARLER app from the App Store.

12

32.    APPLE purportedly removed the PARLER app from the App Store because it was dissatisfied with PARLER's moderation of allegedly dangerous content on PARLER's website. APPLE's purported reason for removing the PARLER app from the App Store was a pretext, inasmuch as TWITTER remains available at the APPLE App Store notwithstanding TWITTER's well-established history of attracting, and maintaining online, numerous posts that incite violence against others, examples of which are described in paragraphs 38-41 below.  On information and belief, APPLE has not made a similar demand to TWITTER that it submit a moderation improvement plan to remove allegedly objectionable content from TWITTER's website, and has not removed the TWITTER app from the App Store.  APPLE's disparate treatment of PARLER and TWITTER makes clear that APPLE's removal of the PARLER app from the App Store was pretextual and was motivated not by any breach of APPLE's terms of service, but rather by animus against President Donald J. Trump and his ideological supporters such as Larry Klayman and FREEDOM WATCH, as well as millions of PARLER users, including Plaintiff FREEDOM WATCH.

33.    While PARLER users who already have the PARLER app on their iPhones will be able to resume using the PARLER social networking platform if it comes back online in the reasonably foreseeable future, PARLER users whose smartphones contain the iPhone operating system (iOS) will eventually lose their ability to access and use PARLER.  APPLE is expected to update its mobile smartphone operating system in September 2021, when APPLE releases iOS 13 (https://ios13update.com), a new version of APPLE's smartphone operating system.  On information and belief, PARLER users will need an app update to be able to continue accessing PARLER on their iPhones equipped with the latest version of iOS.  Thus, APPLE's decision to

remove the PARLER app from the App Store will block existing PARLER users and potential new PARLER users from accessing PARLER using their iPhone smartphones.

34. PARLER's rival social media apps, such as Gab and Rumble, are also now experiencing record growth. *See* Isaac & Browning, *Fact-checked on Facebook and Twitter, supra*. On information and belief, while PARLER has been unavailable, people have turned to those alternatives, and some might even have returned to TWITTER. Not surprisingly, competitor TWITTER's CEO enthusiastically endorsed Defendant AWS's efforts to remove PARLER from the public square. *See* Kevin Shalvey, *Parler's CEO John Matze Responded Angrily After Jack Dorsey Endorsed Apple's Removal of the Social Network Favored by Conservatives,* Business Insider (Jan. 10, 2021), https://businessinsider.com/parler-john-matze-responded-angrily-jack-dorsey-apple-ban-2021-1.

35. When PARLER went offline on January 10, 2021, Plaintiff FREEDOM WATCH had followers on PARLER. The number of followers that FREEDOM WATCH had on PARLER cannot be determined while PARLER's platform is offline.

36. On information and belief, PARLER and FREEDOM WATCH have been and will continue to be severely injured by AWS's malicious and pretextual shutdown of PARLER's social networking platform because, during the period that PARLER is offline, many of its users will migrate to other online social networking platforms which are available on the Internet. On information and belief, once PARLER users have migrated to another platform, many of them will not return to PARLER, and FREEDOM WATCH followers who migrate from PARLER will be lost by FREEDOM WATCH.

37. In addition, on information and belief, PARLER and FREEDOM WATCH have been and will continue to be injured by APPLE and GOOGLE's malicious and pretextual

decision to block iPhone and Android smartphone users from downloading the PARLER app. In addition to blocking potential new PARLER users from access to PARLER's social networking platform, APPLE and GOOGLE's wrongful refusal to allow existing PARLER users access to the PARLER app will block those existing users from staying with PARLER going forward. While PARLER users who already have the PARLER app will be able to access PARLER if it restores its online operations in the reasonably foreseeable future, the existing version of the PARLER app will become obsolete when APPLE and GOOGLE update their smartphone operating software. As a result, even those PARLER users who choose to return to PARLER's platform if it comes back online will be blocked from access to PARLER in the reasonably foreseeable future.

## **FACTS PERTAINING TO INTENTIONAL INTERFERENCE**

38.     On January 9, 2021, AWS announced that it would suspend PARLER's account effective Sunday, January 10, 2021, at 11:59 pm PST. AWS stated as the reason for the suspension that AWS was not confident that PARLER could properly police its platform regarding content that encourages or incites violence against others. However, on Friday night, January 8, 2021, one of the top trending tweets on TWITTER was "Hang Mike Pence." On information and belief, AWS has no plans, nor has it made any threats, to suspend TWITTER's account.

39.     By shutting down PARLER but continuing to provide web hosting services to TWITTER – despite identical conduct by users on both sites – AWS has made clear that its expressed reasons for suspending PARLER's account are pretextual. In its letter announcing the pending termination of service to PARLER, AWS alleged that "[o]ver the past several weeks, we've reported 98 examples to PARLER of posts that clearly encourage and incite violence."

AWS provided some examples, including one that stated, "How bout make them hang?", followed by a series of hashtags, including "#fu--mikepence."

40.     AWS further stated to PARLER that the "violent content on your website . . . violates our terms." On further information and belief, AWS declared that because "we cannot provide services to a customer that is unable to effectively identify and remove content that encourages or incites violence against others," AWS was terminating PARLER's account.

41.     The day before, on Friday, January 8, 2021, one of the top trends on TWITTER was "Hang Mike Pence" with more than 14,000 tweets. *See* Peter Aitken, *'Hang Mike Pence' Trends on Twitter After Platform Suspends Trump for Risk of 'Incitement of Violence'*, Fox News (Jan. 9, 2021), https://foxnews.com/politics/twitter-trending-hang-mike-pence. In addition, earlier in the same week, a Los Angeles Times columnist observed that TWITTER and other social media platforms are partly culpable for the Capitol Hill riot, by allowing rioters to communicate and rile each other up. *See* Erika D. Smith, *How Twitter, Facebook are Partly Culpable for Trump DC Riot*, LA Times (Jan. 6, 2021), https://www.latimes.com/california/story/2021-01-06/how-twitter-facebook-partly-culpable-trump-dc-riot-capitol. These equivalent, if not greater alleged violations of AWS's service terms by TWITTER have been ignored by AWS.

42.     On information and belief, Defendant AWS knew that the allegations contained in the letter it leaked to the press (that PARLER was not able to find and remove content that encouraged violence) were false – because within days after PARLER received the letter, it had removed everything that AWS had brought to its attention. Regardless, AWS sought to defame PARLER and by leaking false claims about PARLER to the public, make it as difficult as

16

possible for PARLER to find an alternative web hosting company.  In short, AWS sought to make PARLER a radioactive pariah among web hosting services providers.

43.     As set forth in paragraphs 16-26 *supra,* Defendant AWS's decision to suspend PARLER's account and cease providing PARLER with web hosting services effectively shut PARLER down.  Defendant AWS's reasons for doing so are completely inconsistent with AWS's treatment of TWITTER, indicating AWS's desire to maliciously and wrongfully harm both PARLER and PARLER's users.  AWS's decision to terminate PARLER's account, cease providing web hosting services, and effectively shut PARLER down was apparently motivated not by any breach of AWS's terms of service, but rather by animus against President Donald J. Trump and his ideological supporters such as Larry Klayman and FREEDOM WATCH, as well as millions of PARLER users, including Plaintiff FREEDOM WATCH.

44.     AWS's malicious and pretextual shutdown of PARLER wrongfully interfered with FREEDOM WATCH's freedom of expression, by depriving FREEDOM WATCH of access to the free speech oriented forum provided by PARLER.  By shutting down PARLER, AWS silenced the millions of PARLER users (including Plaintiff FREEDOM WATCH) whose free speech is being inappropriately, if not illegally, censored by TWITTER and other social media platforms.

45.     Moreover, by shutting down PARLER, AWS deprived Plaintiff FREEDOM WATCH of access to and ability to communicate with existing and potential new PARLER users.   This directly harmed FREEDOM WATCH's participation in public debate and dissemination of its message to concerned American citizens and others around the world.

46.     AWS's wrongful shutdown of PARLER also harmed FREEDOM WATCH's reputation and goodwill, as the public associates users such as FREEDOM WATCH with

17

PARLER and draws negative inferences from AWS's defamation and shutdown of PARLER and from PARLER's sudden absence from the Internet, that PARLER and its users had acted unethically or illegally.

47.    AWS's malicious and intentional shutdown of PARLER has also wrongfully interfered with FREEDOM WATCH's fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

48.    AWS's decision to terminate PARLER's account and effectively shut PARLER down was also designed to unfairly hinder competition from PARLER against TWITTER in the microblogging services market.   As a potential purchaser of advertising on social media platforms, Plaintiff FREEDOM WATCH will be injured by the anticompetitive effects AWS's actions will have on TWITTER's and other social media platforms' prices for advertising.

49.    GOOGLE and APPLE's intentional, malicious, and pretextual move to block iPhone and Android phone users from downloading the PARLER app has injured and will continue to injure both PARLER and Plaintiff FREEDOM WATCH.   In addition to blocking potential new PARLER users from accessing PARLER's social networking platform, APPLE and GOOGLE's wrongful removal of the PARLER app from their online app stores has blocked and will continue to block existing PARLER users from staying with PARLER going forward. While users who already have the PARLER app may theoretically be able to access PARLER if it restores its online operations in the reasonably foreseeable future, the existing version of the PARLER app will become obsolete when APPLE and GOOGLE update their smartphone operating software.   As a result, even those PARLER users who choose to return to PARLER's platform if it comes back online will be blocked from access to PARLER in the reasonably foreseeable future.

50.     GOOGLE's and APPLE's malicious and pretextual removal of the PARLER app from their online stores wrongfully interferes with FREEDOM WATCH's freedom of expression because, when GOOGLE and APPLE update their Android and iOS operating systems, it will deprive FREEDOM WATCH of access to the free speech oriented forum provided by PARLER. By blocking access to PARLER, GOOGLE and APPLE will silence PARLER users (including Plaintiff FREEDOM WATCH), whose free speech is being inappropriately, if not illegally, censored by TWITTER and other social media platforms.

51.     Moreover, by removing the PARLER app from their online stores, GOOGLE and APPLE will deprive Plaintiff FREEDOM WATCH of access to and ability to communicate with existing and potential new PARLER users.  This will directly harm FREEDOM WATCH's participation in public debate and dissemination of its message to concerned American citizens and others around the world.

52.     GOOGLE and APPLE's wrongful removal of the PARLER app from their online stores will also harm FREEDOM WATCH's reputation and goodwill, as the public associates users such as FREEDOM WATCH with PARLER and will draw negative inferences from GOOGLE's and APPLE's removal of the PARLER app from their online app stores that PARLER and its users have acted unethically or illegally.

53.     GOOGLE and APPLE's malicious and pretextual removal of the PARLER app from their online stores has wrongfully interfered with and will continue to wrongfully interfere with Plaintiff FREEDOM WATCH's fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message, as existing PARLER users (including FREEDOM WATCH) and potential new PARLER users will be deprived of access to PARLER's social networking platform.

19

54.     GOOGLE and APPLE's malicious and pretextual removal of the PARLER app from their respective online stores, by hindering PARLER as a growing new entrant in the microblogging services and social networking markets, will also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.

## FIRST CAUSE OF ACTION

### AWS Blocking FREEDOM WATCH's Access to PARLER's Platform by Intentional Interference With PARLER's Business Relationships With Its Users

55.     Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

56.     In Florida, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.  A protected business relationship need not be evidenced by an enforceable contract as long as the relationship affords the plaintiff existing or prospective legal or contractual rights and the understanding or an agreement would have been completed if the defendant had not interfered.

57.     On information belief, until PARLER was shut down by Defendant AWS, PARLER had a business relationship with more than 12 million users.  In addition, PARLER expected to add millions more users during the week of January 11, 2021 in view of the growing voice of conservatives encouraging their TWITTER followers to switch to PARLER.

58.    Defendant AWS knew of PARLER's relationships with its users, as shown by AWS's pretextual reason for terminating its web hosting services to PARLER, which purportedly centered around PARLER's alleged handling of its relationship(s) with its users.

20

59.     AWS's animus toward PARLER and its users, the disparity in AWS's treatment of TWITTER and PARLER, and AWS's leak to the press of its defamatory and pretextual reasons for terminating services to PARLER (set forth in paragraphs 16-26 *supra*) establish that Defendant AWS engaged in intentional and unjustified interference with PARLER's relationships with its users.

60.     Plaintiff FREEDOM WATCH has been damaged and will continue to be damaged by AWS's intentional interference with PARLER's operations and malicious and pretextual shutdown of PARLER's social networking platform.   AWS has thereby denied FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.  AWS has thereby directly interfered with FREEDOM WATCH's participation in vital public debate relating to current events and blocked FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.  This has not only blocked FREEDOM WATCH's access to the public square, but has harmed FREEDOM WATCH's reputation and goodwill, and has wrongfully interfered with and will continue to wrongfully interfere with the fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

61.     By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant AWS's intentional interference with PARLER's operations and malicious and pretextual shutdown of PARLER's social networking platform also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.  This injures FREEDOM WATCH as an advertising purchaser on social media sites.

62.     This action seeks actual and compensatory damages for the harm caused to Plaintiff FREEDOM WATCH by Defendant AWS's wrongful shutdown of PARLER's social networking platform. The pecuniary value of FREEDOM WATCH's lost future fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base. In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER, Facebook, or other social networking platforms will also be inherently difficult to determine. FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty. Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

63.     This action also seeks preliminary and permanent injunctive relief (i) requiring that Defendant AWS restore its web hosting services to PARLER in a manner that enables PARLER to promptly resume online operations as a social networking platform supporting free speech on the Internet and (ii) precluding a repetition of the irreparable harm caused by AWS to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully blocked from access to PARLER's free speech oriented social networking platform.

## SECOND CAUSE OF ACTION

*AWS Blocking FREEDOM WATCH's Access to PARLER's Platform by*
*Intentional Interference With PARLER's Performance of Its Contracts With Its Users*

64.     Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

65.    Florida defines the tort of intentional interference with a contract as follows: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

66.    Until PARLER was shut down by AWS's termination of PARLER's account and wrongful refusal to provide web hosting services to PARLER, PARLER had more than 12 million users under contract.

67.    Defendant AWS intentionally and improperly interfered with PARLER's performance of its contracts with its users by wrongfully terminating its provision of web hosting services to PARLER and defaming PARLER in the press, thereby precluding PARLER from performing its contracts with its users, as described in paragraphs 16-26 *supra*.

68.    PARLER's users, including Plaintiff FREEDOM WATCH, have suffered and will continue to suffer pecuniary loss resulting from PARLER's inability to provide them with access to PARLER's social networking platform.    AWS's intentional interference with PARLER's operations and malicious and pretextual shutdown of PARLER's social networking platform have denied FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.    AWS has thereby directly interfered with FREEDOM WATCH's participation in vital public debate relating to current events and blocked FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.   This has not only blocked FREEDOM WATCH's access to the public square, but has harmed FREEDOM WATCH's reputation and goodwill, and has wrongfully interfered with and

will continue to wrongfully interfere with the fund-raising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

69.    By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant AWS's intentional interference with PARLER's operations and malicious and pretextual shutdown of PARLER's social networking platform also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.  This injures FREEDOM WATCH as an advertising purchaser on social media sites.

70.    For the reasons set forth in paragraphs 68 and 69 above, Plaintiff FREEDOM WATCH seeks compensatory damages for the pecuniary harm caused by Defendant AWS's intentional interference with PARLER's operations and contractual relations with its users.  The pecuniary value of FREEDOM WATCH's lost future fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base.  In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER, Facebook, or other social networking platforms will also be inherently difficult to determine.  FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty.  Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

71.    This action also seeks preliminary and permanent injunctive relief (i) requiring that Defendant AWS restore its web hosting services to PARLER in a manner that enables PARLER to promptly resume online operations as a social networking platform supporting free speech on the Internet and (ii) precluding a repetition of the irreparable harm caused by AWS to

the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully blocked from access to PARLER's free speech oriented social networking platform.

## THIRD CAUSE OF ACTION

### *GOOGLE Blocking FREEDOM WATCH's Access to PARLER's Platform by Intentional Interference With PARLER's Business Relationships With Its Users*

72.     Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

73.     In Florida, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.  A protected business relationship need not be evidenced by an enforceable contract as long as the relationship affords the plaintiff existing or prospective legal or contractual rights and the understanding or an agreement would have been completed if the defendant had not interfered.

74.     On information belief, until PARLER was shut down by Defendant AWS, PARLER had a business relationship with more than 12 million users.  In addition, PARLER expected to add millions more users during the week of January 11, 2021 in view of the growing voice of conservatives encouraging their TWITTER followers to switch to PARLER.

75.  Defendant GOOGLE knew of PARLER's relationships with its users, as shown by GOOGLE's pretextual reason for removing the PARLER app from GOOGLE's Play store, which purportedly centered around PARLER's alleged handling of its relationship(s) with its users.

25

76.     GOOGLE's animus toward PARLER and its users and the disparity in GOOGLE's treatment of TWITTER and PARLER establish that Defendant GOOGLE engaged in intentional and unjustified interference with PARLER's relationships with its users.

77.     Plaintiff FREEDOM WATCH has been damaged and will continue to be damaged by GOOGLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the GOOGLE Play store.  GOOGLE is thereby denying FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.   GOOGLE thereby directly interferes with FREEDOM WATCH's participation in vital public debate relating to current events and blocks FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.  This not only blocks FREEDOM WATCH's access to the public square, but harms FREEDOM WATCH's reputation and goodwill as pled herein.  In addition, it has wrongfully interfered with and will continue to wrongfully interfere with the fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

78.     By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant GOOGLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the GOOGLE Play store also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.   This injures FREEDOM WATCH as an advertising purchaser on social media sites.

79.     This action seeks actual and compensatory damages for the harm caused to Plaintiff FREEDOM WATCH by Defendant GOOGLE's wrongful removal of the PARLER app from GOOGLE's Play store.   The pecuniary value of FREEDOM WATCH's lost future

fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base.   In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER, Facebook, or other social networking platforms will also be inherently difficult to determine. FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty.   Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

80.   This action also seeks preliminary and permanent injunctive relief against Defendant GOOGLE requiring GOOGLE to promptly restore the PARLER app to GOOGLE's Play store, so as to enable PARLER to resume online operations unhindered by GOOGLE's tortious interference, and undo the immediate and irreparable harm being caused by GOOGLE to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully deprived of access to PARLER's social networking platform.

## FOURTH CAUSE OF ACTION

### GOOGLE Blocking FREEDOM WATCH's Access to PARLER's Platform by Intentional Interference With PARLER's Performance of Its Contracts With Its Users

81.   Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

82.   Florida defines the tort of intentional interference with a contract as follows: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third

27

person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

83.   Until PARLER was shut down by AWS's termination of PARLER's account and wrongful refusal to provide web hosting services to PARLER, PARLER had more than 12 million users under contract.

84.   Defendant GOOGLE intentionally and improperly interfered with PARLER's performance of its contracts with its users by maliciously and pretextually removing the PARLER app from the GOOGLE Play store, thereby precluding PARLER from performing its contracts with its users.

85.   PARLER's users, including Plaintiff FREEDOM WATCH, are suffering and will continue to suffer pecuniary loss resulting from PARLER's inability to provide them with access to PARLER's social networking platform.   GOOGLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the GOOGLE Play store denies FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.   GOOGLE is thereby directly interfering with FREEDOM WATCH's participation in vital public debate relating to current events and blocking FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.  This not only blocks FREEDOM WATCH's access to the public square, but harms FREEDOM WATCH's reputation and goodwill as pled herein.   In addition, it has wrongfully interfered with and will continue to wrongfully interfere with the fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

28

86.     By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant GOOGLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the GOOGLE Play store also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.   This injures FREEDOM WATCH as an advertising purchaser on social media sites.

87.     For the reasons set forth in paragraphs 85 and 86 above, Plaintiff FREEDOM WATCH seeks compensatory damages for the pecuniary harm caused by Defendant GOOGLE's intentional interference with PARLER's operations and contractual relations with its users.   The pecuniary value of FREEDOM WATCH's lost future fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base.   In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER, Facebook, or other social networking platforms will also be inherently difficult to determine.   FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty.   Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

88.     This action also seeks preliminary and permanent injunctive relief against Defendant GOOGLE requiring GOOGLE to promptly restore the PARLER app to GOOGLE's Play store, so as to enable PARLER to resume online operations unhindered by GOOGLE's tortious interference, and undo the immediate and irreparable harm being caused by GOOGLE to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM

WATCH) who are being wrongfully blocked from access to PARLER's social networking platform.

## FIFTH CAUSE OF ACTION

### *APPLE Blocking FREEDOM WATCH's Access to PARLER's Platform by Intentional Interference With PARLER's Business Relationships With Its Users*

89.     Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

90.     In Florida, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. A protected business relationship need not be evidenced by an enforceable contract as long as the relationship affords the plaintiff existing or prospective legal or contractual rights and the understanding or an agreement would have been completed if the defendant had not interfered.

91.     On information belief, until PARLER was shut down by Defendant AWS, PARLER had a business relationship with more than 12 million users. In addition, PARLER expected to add millions more users during the week of January 11, 2021 in view of the growing voice of conservatives encouraging their TWITTER followers to switch to PARLER.

92.     Defendant APPLE knew of PARLER's relationships with its users, as shown by APPLE's pretextual reason for removing the PARLER's app from APPLE's App Store, which purportedly centered around PARLER's alleged handling of its relationship(s) with its users.

93.     APPLE's animus toward PARLER and its users and the disparity in APPLE's treatment of TWITTER and PARLER establish that Defendant APPLE engaged in intentional and unjustified interference with PARLER's relationships with its users.

94.     Plaintiff FREEDOM WATCH has been damaged and will continue to be damaged by APPLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the APPLE App Store.  APPLE is thereby denying FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.  APPLE thereby directly interferes with FREEDOM WATCH's participation in vital public debate relating to current events and blocks FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.  This not only blocks FREEDOM WATCH's access to the public square, but harms FREEDOM WATCH's reputation and goodwill as pled herein.  In addition, it has wrongfully interfered with and will continue to wrongfully interfere with the fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

95.     By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant APPLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the APPLE Pay Store also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.   This injures FREEDOM WATCH as an advertising purchaser on social media sites.

96.     This action seeks actual and compensatory damages for the harm caused to Plaintiff FREEDOM WATCH by Defendant APPLE's wrongful removal of the PARLER app from APPLE's App Store.   The pecuniary value of FREEDOM WATCH's lost future fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base.   In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER,

Facebook, or other social networking platforms will also be inherently difficult to determine. FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty. Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

97.     This action also seeks preliminary and permanent injunctive relief against Defendant APPLE requiring APPLE to promptly restore the PARLER app to APPLE's App Store, so as to enable PARLER to resume online operations unhindered by APPLE's tortious interference, and undo the immediate and irreparable harm being cause by APPLE to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully blocked from access to PARLER's social networking platform.

## SIXTH CAUSE OF ACTION

### APPLE Blocking FREEDOM WATCH's Access to PARLER's Platform by Intentional Interference With PARLER's Performance of Its Contracts With Its Users

98.     Plaintiff FREEDOM WATCH re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

99.     Florida defines the tort of intentional interference with a contract as follows: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."

100.    Until PARLER was shut down by AWS's termination of PARLER's account and wrongful refusal to provide web hosting services to PARLER, PARLER had more than 12 million users under contract.

101.    Defendant APPLE intentionally and improperly interfered with PARLER's performance of its contracts with its users by maliciously and pretextually removing the PARLER app from the APPLE App Store, thereby precluding PARLER from performing its contracts with its users.

102.    PARLER's users, including Plaintiff FREEDOM WATCH, have suffered and will continue to suffer pecuniary loss resulting from PARLER's inability to provide them with access to PARLER's social networking platform.   APPLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the APPLE App Store denies FREEDOM WATCH access to and ability to communicate with existing and potential new PARLER users.   APPLE is thereby directly interfering with FREEDOM WATCH's participation in vital public debate relating to current events and blocking FREEDOM WATCH's dissemination of its message to concerned American citizens and others around the world.  This not only blocks FREEDOM WATCH's access to the public square, but harms FREEDOM WATCH's reputation and goodwill as pled here.  In addition, it wrongfully interferes with and will continue to wrongfully interfere with the fundraising necessary to support FREEDOM WATCH's effective and robust delivery of its message.

103.    By hindering PARLER as a growing new entrant in the microblogging services and social networking markets, Defendant APPLE's intentional interference with PARLER's operations and malicious and pretextual removal of the PARLER app from the APPLE App Store also enable competing social networking platforms such as TWITTER and Facebook to charge and maintain supracompetitive prices for advertising on their platforms.  This injures FREEDOM WATCH as an advertising purchaser on social media sites.

104.    For the reasons set forth in paragraphs 102 and 103 above, Plaintiff FREEDOM WATCH seeks compensatory damages for the pecuniary harm caused by Defendant APPLE's intentional interference with PARLER's operations and contractual relations with its users.   The pecuniary value of FREEDOM WATCH's lost future fundraising, as well as the harm to its reputation and goodwill, will be difficult to calculate because of the rapidly increasing nature of PARLER's user base.  In addition, any supracompetitive overcharges FREEDOM WATCH will have to pay to advertise on TWITTER, Facebook, or other social networking platforms will also be inherently difficult to determine.  FREEDOM WATCH might recover nothing, or less than its actual harm, because monetary damages cannot be awarded where they cannot be established with sufficient certainty.  Thus, money damages for this cause of action may not be available to FREEDOM WATCH, or at the least will be insufficient to make FREEDOM WATCH whole.

105.    This action also seeks preliminary and permanent injunctive relief against Defendant APPLE requiring APPLE to promptly restore the PARLER app to APPLE's App Store, so as to enable PARLER to resume online operations unhindered by APPLE's tortious interference, and undo the immediate and irreparable harm being cause by APPLE to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully blocked from access to PARLER's social networking platform.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff FREEDOM WATCH prays for judgment against Defendants AWS, GOOGLE, and APPLE as follows:

a.    Awarding Plaintiff FREEDOM WATCH actual and compensatory damages in an amount greater than $15,000.00 but less than $75,000.00.

b.      Entry of preliminary and permanent injunctive relief against Defendant AWS (i) requiring that AWS restore its web hosting services to PARLER in a manner that enables PARLER to promptly resume online operations as a social networking platform supporting free speech on the Internet and (ii) precluding a repetition of the irreparable harm caused by AWS to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who have been wrongfully deprived of access to PARLER's free speech oriented social networking platform.

c.      Entry of preliminary and permanent injunctive relief against Defendants GOOGLE and APPLE requiring them to promptly restore the PARLER app to GOOGLE's Play store and APPLE's App Store, respectively, so as to enable PARLER to resume online operations unhindered by GOOGLE and APPLE's tortious interference, and undo the immediate and irreparable harm being caused by GOOGLE and APPLE to the online public square and to millions of PARLER users (such as Plaintiff FREEDOM WATCH) who are being wrongfully deprived of access to PARLER's social networking platform.

d.      Granting any further relief that the Court deems appropriate.

Plaintiff FREEDOM WATCH will move for an award of punitive damages in an amount to be determined at the appropriate time under Florida law and procedure.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated: January 24, 2021                    Respectfully submitted,

                                           /s/ Larry Klayman

                                           Larry Klayman, Esq.
                                           General Counsel
                                           FL Bar No. 246220
                                           **FREEDOM WATCH, INC.**
                                           7050 W. Palmetto Park Road

Boca Raton, FL  33433
Tel.:  561-558-5536
Email:  leklayman@gmail.com

Stephen L. Sulzer
Pro Hac Vice (motion pending)
**STEPHEN L. SULZER PLLC**
700 12th Street, N.W., Suite 700
Washington, D.C.  20005
Tel.:  202-499-2301
Email:  ssulzer@sulzerpllc.com

Counsel for FREEDOM WATCH, INC.